1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

ECOLOGICAL RIGHTS FOUNDATION,

Case No. 23-cv-05179-JST

8

Plaintiff,

9

v.

**ORDER DENYING MOTION TO
DISMISS**

10

PACIFICORP, et al.,

Re: ECF No. 32

11

Defendants.

12
13

Before the Court is Defendants PacifiCorp and Pacific Power's (together "PacifiCorp")

14

motion to dismiss Plaintiff Ecological Rights Foundation's ("EcoRights") first amended complaint

15

("FAC"). ECF No. 32. The Court will deny the motion.

16

I.      **BACKGROUND**

17

A.      **Factual Background[1]**

18

EcoRights is a "non-profit public benefit corporation focused on protecting surface waters

19

and groundwater from pollution and degradation." ECF No. 23 ¶ 16. PacifiCorp "is an electrical

20

utility corporation that supplies electricity to parts of Northern California, Oregon, and

21

Washington." *Id.* ¶ 18. "To maintain its electrical distribution system, PacifiCorp operates and

22

maintains numerous corporation yards and service centers throughout its territory" which includes

23

a facility at 1054 Northcrest Drive, Crescent City, California 95531 (the "Crescent City Facility"

24

or "Facility"). *Id.* ¶¶ 2, 77.

25
26
27
28

---

[1] The facts are taken from the First Amended Complaint except where otherwise stated. *See AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012) ("[W]e accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff.").

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1.      Crescent City Facility

The Crescent City Facility "serves as a staging ground for the construction, operation, and maintenance of PacifiCorp's electric transmission and distribution systems." *Id.* ¶ 95.  PacifiCorp stores "new, freshly treated utility poles, used treated utility poles or cross-arms (collectively, 'Poles') and treated wood waste ('TWW[2]')" at the Crescent City Facility.  *Id.* ¶ 2.  The Poles and TWW are treated with "wood preservative formulations, including the pesticide pentachlorophenol, chromium, arsenic, copper naphthenate, and/or 4,5-Dichloro-2-n-octyl-3(2H)-isothiazolone (collectively 'Wood Treatment Mixtures')."  *Id.*  PacifiCorp stores the Poles and TWW uncovered in outdoor areas.  *Id.* ¶ 95.  The Facility includes a transportation terminal and vehicle fueling area where PacifiCorp conducts vehicle maintenance and servicing on light duty and heavy-duty cars, trucks, and cranes.  *Id.* ¶ 97.  Pollution from this activity includes "gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids."  *Id.*  Finally, EcoRights alleges that PacifiCorp stores various construction materials and equipment (including electric transmission and distribution system components) uncovered in outdoor areas.  *Id.* ¶ 98.  PacifiCorp has not applied for an individual National Pollutant Discharge Elimination System ("NPDES") permit for the Crescent City Facility.  *Id.* ¶ 171.

### 2.      Alleged Clean Water Act and Resource Conservation and Recovery Act Violations

EcoRights asserts two claims: (1) violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1387 and (2) violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992.

First, because the Poles and TWW are stored outdoors in uncovered areas, EcoRights alleges that Wood Treatment Mixtures and associated chemicals (collectively "Wood Treatment Waste") drip off the Poles and TWW and are collected by storm water at the Crescent City Facility.  ECF No. 23 ¶ 100.  Similarly, pollutants are also collected from the transportation

---

[2] "TWW means any wood items or fragments thereof that have been treated with any of the Wood Treatment Mixtures but that are not complete Poles and/or cross-arms destined for service, which includes, but is not limited to, out of service utility poles, used utility pole segments, out of service cross arms, used cross arm segments, sawdust, splinters, wood chips, and any other wood pieces and/or fragments."  ECF No. 23 ¶ 2 n.1.

2

terminal and the uncovered storage of construction materials. *Id.* ¶¶ 95–97, 102. Thereafter, EcoRights alleges that the storm water collects in, and moves through "culverts, storm water collection vaults, ditches, gutters, and other conveyances and surface channels at, and adjacent to the Crescent City Facility; drop inlets that connect with underground storm sewer pipes . . . and other conveyances," and ultimately "into waters of the United States, including but not limited to, Elk Creek in Crescent City, California and its estuary and tributaries; the Elk Creek Wetlands Wildlife Area; Crescent City Harbor; and the Pacific Ocean in and around Crescent City Harbor." *Id.* ¶¶ 100, 103. EcoRights argues that the Facility's stormwater discharges violate the CWA. *Id.* ¶¶ 169–179.

Second, EcoRights alleges that PacifiCorp's use, storage, and movement of the Poles and/or TWW "causes the Wood Treatment Wastes to infiltrate into and contaminates soils and groundwater." *Id.* ¶ 48. In addition to stormwater discharge, EcoRights alleges that the Wood Treatment Wastes are also discharged from the Crescent City Facility by "tracking from vehicles and/or foot traffic and/or by wind, leaf blower, sweeping, power washing, and/or other natural or artificial processes." *Id.* ¶¶ 48, 61. EcoRights claims that the Wood Treatment Wastes present an imminent and substantial endangerment to the health of communities and the environment in violation of RCRA. *Id.* ¶ 49. EcoRights alleges that its members use and enjoy the waters, wildlife, and other natural resources that are adversely impacted and endangered by PacifiCorp's contaminated discharges. *Id.* ¶ 17.

### B.   Procedural Background

On June 7, 2023, EcoRights served a citizen suit notice letter ("Notice Letter") on PacifiCorp regarding alleged violations of RCRA and the CWA at the Crescent City Facility, stating EcoRights' intention to file suit against PacifiCorp. ECF No. 23 ¶ 10; *see also* 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2; 42 U.S.C. § 6972(b). Thereafter, EcoRights filed its complaint on October 11, 2023. ECF No. 1. PacifiCorp filed a motion to dismiss on November 17, 2023. ECF No. 17. EcoRights filed its FAC as a matter of right on November 29, 2023. ECF No. 23. PacifiCorp then filed the instant motion to dismiss EcoRights' FAC. ECF No. 32. The Court heard argument on the motion on March 14, 2024. ECF No. 62. The parties requested, and the

1    Court allowed, the filing of a joint supplemental brief on June 12, 2024.  ECF Nos. 74, 75.

2            PacifiCorp challenges the sufficiency of EcoRights' CWA and RCRA claims.  PacifiCorp

3    also argues that EcoRights waived the right to bring RCRA claims.

4    **II.        JURISDICTION**

5            The Court has jurisdiction under 28 U.S.C. § 1331.

6    **III.       REQUEST FOR JUDICIAL NOTICE**

7            The Court first addresses the parties' requests for judicial notice.  PacifiCorp requests

8    judicial notice of several documents[3] in support of its motion to dismiss and its reply.  ECF No. 32

9    at 9–10; ECF No. 47; *see also* Fed. R. Evid. 201(b).  EcoRights opposes the request for judicial

10   notice for Exhibits E and F (the site plan and the list of PacifiCorp's power generation and

11   transmission facilities) because the documents are "subject to reasonable dispute" since the "facts

12   asserted therein are neither 'generally known' . . . nor "can [they] be accurately and readily

13   determined from sources whose accuracy cannot reasonably be questioned."  ECF No. 40 at 2

14   (citing Fed. R. Evid. 201(b)).  EcoRights also opposes the inclusion of Exhibits G through L, filed

15   in support of PacifiCorp's reply, ECF Nos. 46-1 to 46-6, because allowing PacifiCorp to introduce

16

17   [3] Exhibit B: The California State Water Resources Control Board's ("Board") IGP Fact Sheet,
     ECF No. 17-2 at 8; Exhibit C: The Board's April 1, 2014, Order establishing its Industrial Storm

18   Water General Permit Program, and Attachment A to that Order, ECF No. 18-1 at 4; Exhibit D:
     The Introduction to the Occupational and Safety Health Administration's 1987 Standard Industrial

19   Classification ("SIC") Manual, ECF No. 18-1 at 82; Exhibit E: A site plan of the Crescent City
     Facility, showing the location of various activities and storage areas at the Facility, ECF No. 18-1

20   at 92; Exhibit F: A list of all PacifiCorp's power generation and transmission facilities located
     near Crescent City California, as identified by the Board, ECF No. 18-1 at 94; Exhibit G: A

21   service copy of the EcoRights' CWA and RCRA Notice Letter to PacifiCorp including the post-
     mark and receipt information, ECF No. 46-1; Exhibit H: California State Water Resources Board's

22   National Pollution Discharge Elimination System (NPDES) General Permit for Storm Water
     Discharges From Small Municipal Separate Storm Sewer Systems, ECF No. 46-2; Exhibit I:

23   Crescent City Municipal Code § 12.36.120 and § 12.36.280, ECF No. 46-3; Exhibit J: A
     screenshot of the State Water Board's website for its industrial storm water regulatory program,

24   which can be accessed at the following website:
     https://waterboards.ca.gov/water_issues/programs/stormwater/industrial.html, ECF No. 46-4;

25   Exhibit K: A screenshot of the website describing SIC Code 4231 from
     https://www.naics.com/sic-industry-description/?code=4231, ECF No. 46-5; Exhibit L: A

26   screenshot of the website describing SIC Code 1442 from https://www.naics.com/sic-industry-
     description/?code=1442, ECF No. 46-6.

27

28

United States District Court
Northern District of California

1   these documents denies EcoRights a "fair opportunity to address or otherwise respond to the new

2   evidence."  ECF No. 52 at 2.

3       Separately, in support of its opposition to PacifiCorp's motion to dismiss, EcoRights

4   attaches the declaration of Stuart Wilcox ("Wilcox Declaration") and several exhibits.  ECF Nos.

5   39-2 to 39-7.[4]  PacifiCorp objects to the Wilcox Declaration and the supporting exhibits.  ECF No.

6   49.  The exhibits are not accompanied by a request for judicial notice.

7       "Generally, district courts may not consider material outside the pleadings when assessing

8   the sufficiency of a complaint under Rule 12(b)(6)."  *Khoja v. Orexigen Therapeutics, Inc.*, 899

9   F.3d 988, 998 (9th Cir. 2018).  An exception allows a court to consider "matters of public record

10  without converting a motion to dismiss into a motion for summary judgment."  *Id.* at 999.  But a

11  court cannot take notice of disputed facts contained in such public records.  *Id.* (citing Fed. R.

12  Evid. 201(b)).  "Courts routinely take judicial notice of letters published by the government . . . as

13  well as records and reports of administrative bodies."  *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d

14  843, 851 n.10 (9th Cir. 2016) (citations and internal quotation marks omitted).

15      The Court declines to take judicial notice of PacifiCorp's Exhibits E, F, G, I, J, K, and L

16  because it finds the documents unnecessary to resolve the instant motion.  *Cal. Sportfishing*

17  *Protection All. v. Shiloh Grp., LLC*, 268 F. Supp. 3d 1029, 1039 (N.D. Cal. 2017) (denying request

18  for judicial notice of documents the court did not consider in deciding the motion).  Despite

19  ───────────────

20  [4] Exhibit 1: Proof of Service, ECF No. 39-2; Exhibit 2: *L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*, No. 20-cv-5330, Dkt. 48 (motion to dismiss) (C.D. Cal. August 19, 2020), ECF No.

21  39-3; Exhibit 3: second amended complaint filed in *LA Waterkeeper v. SSA Terminals, LLC*, No. 22-01198, Dkt. 93-1 (C.D. Cal. Dec. 15, 2023), ECF No. 39-4; Exhibit 4: Attachment C, Glossary,

22  to the State Water Resources Control Board's "National Pollution Discharge Elimination System (NPDES) General Permit for Storm Water Discharges Associated with Industrial Activities,"

23  Order NPDES No. CAS000001, Order No. 2014-0057-DWQ, As Amended by Order No. WQ 2015-0122-DWQ & Order No. WQ 2018-0028-DWQ.  Available online at:

24  https://www.waterboards.ca.gov/board_decisions/adopted_orders/water_quality/2018/wqo2018-0028-dwq.pdf, ECF No. 39-5; Exhibit 5: State Water Resources Control Board in *Ecological*

25  *Rights Foundation, et al., v. Hot Line Construction, Inc., et al.*, 20-1108, ECF No. 39-6; Exhibit 6:

26  Excerpt of a June 12, 2014 Memorandum drafted by the U.S. Environmental Protection Agency entitled "Ninth Circuit Court of Appeals Decision in Ecological Rights Foundation v. Pacific Gas

27  and Electric Company Regarding the RCRA Definition of Solid Waste."  Available online at: https://www.epa.gov/sites/default/files/2014-07/documents/erfpgeco-rcramemo.pdf, ECF No. 39-

28  7.

United States District Court
Northern District of California

1  EcoRights' initial objection to Exhibit H, it ultimately used and addressed this document in its sur-

2  reply.  ECF No. 59 at 3.  Accordingly, the Court takes judicial notice of Exhibit H.  The Court also

3  grants PacifiCorp's request for judicial notice of the remaining documents as public records but

4  limits the judicially noticed fact in each instance to the existence of the document, not the truth of

5  the matters asserted in the documents.  *Cal. Sportfishing Protection All.*, 268 F. Supp. 3d at 1038.

6  The Court has not considered the exhibits to the Wilcox Declaration because they are not properly

7  before the Court.

8      **IV.**    **LEGAL STANDARD**[5]

9         To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

10  complaint must contain "a short and plain statement of the claim showing that the pleader is

11  entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Dismissal "is appropriate only where the complaint

12  lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."

13  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  "[A] complaint

14  must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

15  on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

16  550 U.S. 544, 570 (2007)).  Factual allegations need not be detailed, but facts must be "enough to

17  raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

18         "A claim has facial plausibility when the plaintiff pleads factual content that allows the

19  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

20  *Iqbal*, 556 U.S. at 678.  While this standard is not "akin to a 'probability requirement,' . . . it asks

21  for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*,

22  550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's

23  liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"

24  _____

25  [5] The motion is styled as having been made under Rules 12(b)(1) and 12(b)(6) of the Federal
Rules of Civil Procedure.  ECF No. 32 at 7.  Beyond that single reference to Rule 12(b)(1),

26  however, there is no discussion of the Court's jurisdiction (or lack thereof) over the case, and
during the motion hearing, defense counsel conceded that PacifiCorp's motion contained "no

27  jurisdictional argument."  ECF No. 64 at 2:18–25.  The reference to Rule 12(b)(1) appears to have
been imported from Defendant's prior motion to dismiss.  ECF No. 17-1 at 5, 16–17.  Because

28  Defendants make no substantive arguments concerning Rule 12(b)(1), the Court applies only the
legal standard for a motion to dismiss under Rule 12(b)(6).

1    *Id.* (quoting *Twombly*, 550 U.S. at 557).  In determining whether a plaintiff has met the

2    plausibility requirement, a court must "accept all factual allegations in the complaint as true and

3    construe the pleadings in the light most favorable" to the plaintiff.  *Knievel v. ESPN*, 393 F.3d

4    1068, 1072 (9th Cir. 2005).  A plaintiff may "plead[] facts alleged upon information and belief

5    where the facts are peculiarly within the possession and control of the defendant or where the

6    belief is based on factual information that makes the inference of culpability plausible."  *Soo Park*

7    *v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Arista Recs., LLC v. Doe 3*, 603 F.3d

8    110, 120 (2d Cir. 2010)).

9    ## V.    DISCUSSION

10   ### A.    Clean Water Act

11   The CWA is designed to "restore and maintain the chemical, physical, and biological

12   integrity of the Nation's waters."  *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502,

13   505 (9th Cir. 2013) ("*ERF I*") (citing 33 U.S.C. § 1251(a)).  With limited exceptions, it prohibits

14   the discharge of pollutants into the navigable waters of the United States.  33 U.S.C. §§ 1311(a),

15   1362(12).  Any discharge of a pollutant from a point source into navigable waters is unlawful

16   unless the discharge is covered by a NPDES permit.  33 U.S.C. § 1311(a).

17   Stormwater presents a "unique problem under the CWA, because it is a significant source

18   of water pollution but is not 'inherently a nonpoint or point source.'"  *ERF I*, 713 F.3d at 505.

19   Congress amended the CWA in 1987 to regulate stormwater, establishing a two-phased approach.

20   *Id.*  In Phase I, "EPA required NPDES permits for the most significant stormwater discharges:

21   those from a prior permitted source or large municipality; those that "contribute[ ] to a violation of

22   a water quality standard or [are] a significant contributor of pollutants to waters of the United

23   States;" and, relevant here, those "associated with industrial activity."  *Id.*  In Phase II, the EPA

24   promulgated regulations that required permitting for storm water discharges from small municipal

25   facilities ("MS4") and from construction activity disturbing between one and five acres.  *Id.*; *see*

26   *also* 40 C.F.R. § 122.26(a)(9)(i).

27   Each state administers its own EPA-approved permit program for discharges.  33 U.S.C.

28   § 1342(b).  In California, the State Water Resources Control Board ("State Board") has approval

United States District Court
Northern District of California

from the EPA to administer the NPDES permit program for the State.  ECF No. 23 ¶ 28; ECF No. 17-2 at 8.  The State Board issues NPDES permits regulating discharges.  *Id.*  For this purpose, the State Board adopted the "National Pollution Discharge Elimination System (NPDES) General Permit for Storm Water Discharges Associated with Industrial Activities."  ECF No. 18-1 at 4.  However, a State Board's decision to leave a facility unregulated does not foreclose a court from finding that a facility's stormwater discharge into navigable waters violates the CWA.  *Ass'n to Protect Hammersley v. Taylor Res.*, 299 F.3d 1007, 1012–13 (9th Cir. 2002); *see also S.F. Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 706 (9th Cir. 2017) ("[W]e have held that a court may, in entertaining a citizen suit, decide whether a discharge of particular matter into navigable waters violates the CWA even though the regulating agency determined that the discharge was not subject to the requirement of a permit.")

Accordingly, to state a claim under the CWA, a plaintiff must allege "(1) the ongoing addition of (2) a pollutant (3) to the navigable waters of the United States (4) from a point source (5) without a permit (or in violation of a permit)."  *Woodward v. Goodwin*, No. 99-cv-1103-MJJ, 2000 WL 694102, at *5 (N.D. Cal. May 12, 2000).  Furthermore, considering the special circumstances surrounding stormwater, a plaintiff must also allege that the discharges fell within the Phase I or Phase II categories of stormwater discharges that are required to obtain a permit. *ERF I*, 713 F.3d at 505–506.

PacifiCorp argues that EcoRights has not adequately alleged that: (1) discharges from the Crescent City Facility come from a point source; and that (2) the Crescent City facility generates stormwater "associated with industrial activity."  ECF No. 32 at 10–18.  Instead, PacifiCorp claims that the Facility is covered by Crescent City's MS4 permit.  ECF No. 45 at 6–9.  The Court reviews each of these arguments in turn.

### 1.    Point Source

Although PacifiCorp initially argues that EcoRights failed to allege that discharges from PacifiCorp's Crescent City Facility are conveyed by a "point source," ECF No. 32 at 10–12, it later concedes this point, ECF No. 45 at 8 ("EcoRights has alleged multiple 'point sources' by conveyances, inlets, pipes, etc. at the Facility.").  Accordingly, because the parties agree that

1   EcoRights has adequately alleged point sources as required under the CWA, the Court denies the

2   motion on this ground.

3   **2.    Municipal Stormwater Permit**

4   Having admitted that EcoRights has alleged a point source, PacifiCorp argues for the first

5   time in its reply brief that the Crescent City Facility is not "required to obtain coverage . . . since

6   its discharges were chosen not to be regulated directly," and are instead regulated "under the

7   State's Phase II Small MS4 General Permit." ECF No. 45 at 6–9. In its sur-reply, EcoRights

8   responds that neither the CWA nor EPA's implementing regulations allow for a point source to be

9   exempted based on the existence of a municipal discharge permit for the City. ECF No. 59 at 2–5.

10   The question before this Court is whether Crescent City's MS4 permit obviates the need

11   for a separate industrial stormwater discharge permit. The Court concludes that it does not.

12   Although there is no clear Ninth Circuit guidance on this issue, the plain language of the CWA,

13   implementing EPA regulations, and the Crescent City MS4 permit indicate that there is a need for

14   an independent permit for an industrial facility even if there is a pre-existing MS4 permit for the

15   City.

16   The CWA provides for separate permits for stormwater discharges from an industrial

17   facility and stormwater discharges from municipal sources. *Compare* 33 U.S.C § 1342(p)(3)(A)

18   and 1342(p)(3)(B) (separate permit requirements for industrial discharges and municipal

19   discharges). Furthermore, as described above, EPA implemented regulations for industrial and

20   municipal discharges in two phases—Phase I covering industrial activities and large municipal

21   facilities, and Phase II covering small municipal facilities. *ERF I*, 713 F.3d at 505. EPA's final

22   rules for permits also view industrial stormwater permits as separate and distinct from municipal

23   permits. The NPDES regulation preamble finds that "discharges *through* a municipal storm sewer

24   need to be covered by an NPDES permit that is independent of the permit issued for discharges

25   *from* the municipal separate sewer system." *National Pollutant Discharge Elimination System*

26   *Permit Application Regulations for Storm Water Discharges*, 55 Fed. Reg. 47,990, 47,995 (Nov.

27   16, 1990) (codified at 40 C.F.R. pts. 9, 122, 123 and 124) (emphasis added). Thus, the statutory

28   structure and implementing regulations envision "different permitting schemes, serving discrete

1    purposes" for "stormwater discharges from three potential sources: municipal separate storm

2    sewer systems, construction activities, and industrial activities." *Conservation L. Found., Inc. v.*

3    *Pease Dev. Auth.*, No. 16-cv-493-SM, 2017 WL 4310997, at *9 (D.N.H. Sept. 26, 2017).  The

4    distinct permitting requirements give "rise to an inference that the [] sources invoke different

5    environmental concerns, requiring separate monitoring and management efforts." *Id.*; *see also*

6    *Puget Soundkeeper All. v. Cruise Terminals of Am., LLC*, 216 F. Supp. 3d 1198, 1207–08 (W.D.

7    Wash. 2015); *Kleinman v. City of Austin*, No. 1:15–CV–497–RP, 2017 WL 3585792, at *5 (W.D.

8    Tex. Aug. 18, 2017).

9         The Crecent City MS4 Permit also expressly states that the MS4 permittee must

10   "determine if the facilities that are required to be covered under the Statewide Industrial General

11   Permit have done so," and if they have not, the permittee must "notify the appropriate Regional

12   Water Board."  ECF No. 46-2 at 6.  Accordingly, "[t]he Municipal Permit itself states that a

13   separate NPDES permit is required for facilities that create stormwater discharges associated with

14   industrial activity." *Puget Soundkeeper All.*, 216 F. Supp. 3d at 1207–08.

15        If the Crescent City Facility does, in fact, qualify as an operator of an industrial facility

16   under the regulations, the Facility is required to secure permit coverage to discharge industrial

17   stormwater regardless of whether the City has an independent MS4 permit for its municipal

18   discharges.  The Court will not dismiss the complaint based on the existence of Crescent City's

19   MS4 permit.

20                    **3.    Industrial Activity**

21        PacifiCorp argues that EcoRights has failed to state a claim under the CWA because

22   EcoRights has failed to allege how the Crescent City Facility qualifies as an "industrial activity"

23   such that PacifiCorp would be required to obtain a stormwater discharge or NPDES permit.  ECF

24   No. 32 at 13–16.  Instead, PacifiCorp claims that the Facility is an "auxiliary facility" supporting

25   its primary activity of electrical power generation and distribution that is exempt from such

26   permitting requirements.  *Id.* at 17–18.  Neither argument is persuasive.

27                    **a.    Primary Industrial Activity**

28        The CWA requires an NPDES permit for storm water discharges "associated with

United States District Court
Northern District of California

industrial activity." *Friends of Outlet Creek v. Grist Creek Aggregates, LLC*, No. 16-CV-00431-JSW, 2019 WL 1975434, at *7 (N.D. Cal. Mar. 19, 2019); 33 U.S.C. § 1342(p)(2)(B).  Discharges from industrial activity are "discharge[s] from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage at an industrial plant."  40 C.F.R. § 122.26(b)(14).  EPA's regulations list several categories of industrial facilities that "are engaging in 'industrial activity'" for purposes of Section 122.26(b)(14).  *Id.*  The list includes certain Standard Industrial Classification ("SIC") code categories that meet the definition of industrial activity.  *Id.*  EPA's definition also includes a narrative description of covered industrial activities, including "industrial plant yards . . . material handling sites . . . sites used for the storage and maintenance of material handling equipment . . . shipping and receiving areas . . . storage areas . . . for raw materials . . .  and areas where industrial activity has taken place in the past and significant materials remain."  *Id.*  However, courts have recognized at least one exception—the Ninth Circuit has determined that SIC Code 4911 for electrical services does "not appear to be included or implicated in [industrial activities under] 40 C.F.R. § 122.26(b)(14)."  *ERF I*, 713 F.3d at 512, n.7.

The State Board is the regulatory body in charge of implementing EPA's regulations and issuing the relevant stormwater permits to dischargers.  The State Board's NPDES General Permit fact sheet states that the:

> General Permit provides regulatory coverage for all facilities with industrial activities . . . where the covered industrial activity is the Discharger's ***primary industrial activity***.  In some instances, a Discharger ***may have more than one primary industrial activity*** occurring at a facility.

ECF No. 17-2 at 18 (emphasis added); *Eden Env. Citizen's Grp., LLC v. Cal. Cascade Bldg. Materials, Inc.*, No. 19-cv-1936-TLN-KJN, 2021 WL 4286464, at *5 (E.D. Cal. Sept. 21, 2021).  The SIC Manual further explains that whether an activity is "primary" turns on whether "the employment in each such economic activity is significant" and whether "separate reports can be prepared on the number of employees, their wages and salaries, sales or receipts."  ECF No. 18-1 at 84.

United States District Court
Northern District of California

1     PacifiCorp argues that "none of the activities EcoRights alleges constitute the Facility's

2  'primary activity'—supporting electrical power generation and distribution" that is, SIC Code

3  4911.  ECF No. 45 at 6.  PacifiCorp further contends that "EcoRights exaggerates the maintenance

4  activities . . . to create the 'wholesale distribution of scrap and waste materials' where none exists,

5  vehicle operations to fit its narrative, and oversell[s] the extent of sand and gravel operations, none

6  of which are 'primary' or even 'distinct and separate economic activities' for the Facility."  ECF

7  No. 32 at 16.

8     As PacifiCorp points out, "EcoRights must 'plausibly' allege that PacifiCorp engages in

9  activity that fits within the 11 specific SIC codes cited in the regulation, 40 C.F.R. §

10  122.26(b)(14)(i)–(xi), or the 9 categories of facilities the Board has identified as requiring a []

11  permit."  ECF No. 45 at 6.  At the pleadings stage, a plaintiff's factual allegations must be

12  accepted as true.  *Knievel*, 393 F.3d at 1072.  The FAC sets forth in detail how the Crescent City

13  Facility may be classified within SIC Codes 5093 (recycling activities), ECF No. 23 ¶¶ 79–81,

14  4231 (motor vehicle maintenance activities), *id.* ¶¶ 82–87, and 1442 (sand and gravel handling

15  activities), *id.* ¶¶ 88–89.  It also alleges on information and belief that employment and revenue

16  generation in these activities are significant and that these activities constitute "primary industrial"

17  activities.  *Id.* ¶¶ 80, 85–86, 89, 91.  PacifiCorp's factual disagreement about the primary activity

18  of the Crescent City Facility is irrelevant at the motion to dismiss stage; PacifiCorp has failed to

19  show that the Crescent City Facility *must* be classified as SIC Code 4911 by virtue of the

20  provisions of either the CWA or its implementing regulations.  Furthermore, the FAC alleges that

21  the Facility falls within the narrative description of industrial activity including a "material

22  handling site" and "storage area for raw materials."  *Id.* ¶ 92.  As EcoRights points out, and the

23  Court agrees, PacifiCorp entirely ignores this alternative narrative basis for permit coverage,

24  thereby effectively conceding this point.  ECF No. 39 at 18; *Bluestar Genomics v. Song*, No. 21-

25  CV-04507-JST, 2023 WL 8852735, at *6 (N.D. Cal. Dec. 21, 2023) (citing *Lou v. Am. Honda*

26  *Motor Co., Inc.*, No. 16-CV-04384-JST, 2022 WL 18539358, at *2 (N.D. Cal. Aug. 26, 2022)).

27     EcoRights has plausibly pleaded that the Crescent City Facility may properly be classified

28  under certain SIC Codes or other narrative descriptions.  Accordingly, the Court denies

1   PacifiCorp's motion to dismiss on these grounds.

2                          **b.      Auxiliary Facility**

3            PacifiCorp contends that even if EcoRights alleges primary industrial activities for which a

4   permit is required, its claims under the CWA fail because the Facility is "auxiliary" and therefore

5   exempt from permitting requirements.[6]  ECF No. 32 at 17–18.

6            The SIC Manual defines auxiliaries as:

7                  [E]stablishments [i.e., economic units] primarily engaged in
                   performing management or support services for other establishments
8                  of the same enterprise . . . A unit that performs auxiliary functions
                   and is located physically separate from the establishment or
9                  establishments served is treated as a separate establishment.
                                                  . . .
10
                   The following are examples of auxiliary establishments primarily
11                 engaged in performing management or support services for other
                   establishments of the same enterprise:
12                                                . . .
13                     (3) Warehouses and storage facilities primarily serving other
                       establishments of the same enterprise.
14
15                     (4) Maintenance and repair shops primarily serving other
                       establishments of the same enterprise for the maintenance
16                     and repair of its own machinery and equipment.

17  ECF No. 18-1 at 85–87.  "An establishment is not necessarily identical with the enterprise

18  (company) which may consist of one or more establishments."  *Id.* at 84.  The SIC Manual also

19  provides a carve-out for electrical operations:

20                 For activities such as . . . electric, gas, . . . and similar physically
                   dispersed operations, establishments are represented by those
21                 relatively permanent main or branch offices, terminals, stations, etc.,
                   that are either (1) directly responsible for supervising such activities,
22                 or (2) the base from which personnel operate to carry out these
                   activities.  Hence, the individual sites, projects, fields, networks,
23                 lines, or systems of such dispersed activities are not ordinarily
                   considered to be establishments.
24

25   _____

26  [6] EcoRights submits evidence from a State Board email to explain how the SIC Manual should be
     interpreted.  ECF No. 39 at 20.  PacifiCorp asks this Court to give the State Board's interpretation
27  of the SIC Manual deference under *Skidmore v. Swift Co.*, 323 U.S. 134 (1944).  ECF No. 45 at
     11.  However, as described above, PacifiCorp also filed an objection to EcoRights' inclusion of
28  the Board letter and asked this Court to "ignore all such material."  *Id.* at n.5.  The Court has not
     considered the Board's interpretation of the SIC Manual.

                                              13

1   *Id.*  PacifiCorp argues that the Crescent City Facility and its storage and other support functions

2   should be considered "auxiliary" to PacifiCorp's primary industrial activity—supporting the

3   generation and transmission of electrical power, and that the Facility does not need a discharge

4   permit.  ECF No. 32 at 17–18.  EcoRights proffers two responses.  First, that "the 'individual

5   sites' that do not constitute establishments are the physically dispersed networks or lines, such as

6   PacifiCorp's dispersed electricity lines," and that the Facility "is not a 'physically dispersed

7   operation,' but . . . [a] 'relatively permanent' location that the SIC Manual says can constitute an

8   'establishment.'"  ECF No. 39 at 19.  Second, EcoRights contends that there is a difference

9   between auxiliary "functions" and auxiliary "facilities."  *Id.* at 19–20.  That is, "for a multi-

10  activity facility, each establishment must be analyzed to determine if it is 'auxiliary.'"  *Id.*  If a

11  facility has "more than one establishment, and one is not an 'auxiliary,' the facility requires

12  General Permit coverage for that non-auxiliary establishment."  *Id.*

13         Regardless of how the parties interpret the SIC Manual, ultimately, they disagree about

14  whether there is more than one activity at the Facility.  If even one of those activities are properly

15  classified as a primary industrial activity, and not an "auxiliary" to other establishments run by

16  PacifiCorp, then a permit is required.  These are factual questions that cannot be resolved at the

17  pleading stage.  As described above, EcoRights alleges that "PacifiCorp conducts functions that do

18  not provide support services to its generation and transmission of electrical power" including for

19  example recycling activities, ECF No. 23 ¶¶ 79–81, motor vehicle maintenance activities, *id.* ¶¶

20  82–87, and sand and gravel handling activities, *id.* ¶¶ 88–89.  ECF No. 39 at 20.  This is sufficient

21  to allege that the Crescent City Facility generates stormwater "associated with industrial activity."

22                     **B.**      **Resource Conservation and Recovery Act**

23         To state a claim under the citizen-suit provision of RCRA, EcoRights must allege that

24  PacifiCorp "(1) has contributed or . . . is contributing to the past or present handling, storage,

25  treatment, transportation, or disposal (2) of any solid or hazardous waste, (3) which may present

26  an imminent and substantial endangerment to health or the environment."  *Ctr. for Biological*

27  *Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 950 (9th Cir. 2023) (internal quotation marks

28  omitted).

United States District Court
Northern District of California

PacifiCorp argues that EcoRights waived its RCRA claims by failing to present them in its initial complaint; and in the alternative that, EcoRights has failed to meet each of the prongs required to state a claim under RCRA.  ECF No. 32 at 18–22.

### 1. Waiver

EcoRights' initial complaint stated that it "does not seek redress for PacifiCorp's violation of the RCRA at the Crescent City Facility . . . Only PacifiCorp's violations of the CWA at the Crescent City Facility are addressed in this Complaint."  ECF 1 at ¶ 9 n.2.  PacifiCorp argues EcoRights waived its right to bring a RCRA claim by "affirmatively disclaiming its RCRA claim in its initial Complaint more than ninety (90) days after EcoRights' notice of its intent to sue." ECF No. 32 at 2, 19.  EcoRights responds that at the time of its initial complaint, it believed the Court did not have subject matter jurisdiction over its RCRA claim because it believed the 90-day notice period under RCRA had not elapsed.  ECF No. 39 at 22.  EcoRights contends that once the notice period elapsed, it timely filed an amended complaint.  *Id.*

PacifiCorp's position is without substance.  Federal Rule of Civil Procedure 15(a) provides:

> (1) Amending as a Matter of Course.  A party may amend its pleading once as a matter of course within:
>      (A) 21 days after serving it, or
>      (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

Fed. R. Civ. P. 15(a).  The Ninth Circuit views "Rule 15(a)(1)'s ability to amend as a right . . . which is exhausted or limited only by the restrictions set forth in the Rule itself."  *Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1007–08 (9th Cir. 2015) (collecting cases finding that a plaintiff has an absolute right to amend once as long as it is timely.)  Under RCRA, a citizen plaintiff must give notice to the alleged violator at least 90 days before filing suit under RCRA. 42 U.S.C. § 6972(b)(2)(A).

EcoRights was permitted to amend "as of right" "21 days after" PacifiCorp's motion to dismiss, Fed. R. Civ. P. 15(a)(1)(B), and it did so.  PacifiCorp offers no authority in support of its contention that EcoRights waived its RCRA claim by not bringing it in its initial complaint, and

1    the Court rejects the contention.  PacifiCorp's motion to dismiss on this ground is denied.

2                  **2.      Active Storage, Transport, or Disposal of Hazardous Substances**

3            PacifiCorp claims that EcoRights has offered "no allegations that PacifiCorp is engaged in

4    active storage, transport or disposal of hazardous substances, rendering its RCRA claim

5    defective."  ECF No. 32 at 22.  EcoRights responds that "PacifiCorp has a 'measure of control' or

6    is 'otherwise actively involved' with the handling, storage, treatment, transportation, and/or

7    disposal of the solid waste."  ECF No. 39 at 28.

8            To state a RCRA claim, a plaintiff must allege that the defendant was "directly connected"

9    to the waste disposal process—such as shipping waste to hazardous waste treatment, storage, or

10   disposal facilities.  *Cal. River Watch v. City of Vacaville*, 39 F.4th 624, 632–33 (9th Cir. 2022).

11   Furthermore, RCRA requires more than just hypothetical control to establish contributor liability.

12   *Id.* at 953 (citing *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1101 (9th Cir.

13   2017) ("*ERF II*") (merely identifying tire-tracking (a passive method of waste disposal) as a

14   "potential mechanism" by which a defendant might have contributed to dispersal of wastes, does

15   not establish actual contribution.)  That is, EcoRights must allege that PacifiCorp was "actively

16   involved in or [has] some degree of control over the waste disposal process to be liable under [the]

17   RCRA."  *Ctr. for Biological Diversity*, 80 F.4th at 950.

18           PacifiCorp does not dispute that "it has some level of control over the Poles at the Facility,

19   but [argues it] is not engaging in waste disposal, or 'disposal' of any kind.  Any waste disposal

20   occurs off-site by another company, and any recycling of the Poles does not, by definition,

21   constitute the disposal of waste." [7]  ECF No. 45 at 16–17.  The FAC alleges that PacifiCorp's "use,

22   storage, moving . . . related to the Poles and/or TWW" releases Wood Treatment Waste into the

23   environment.  ECF No. 23 ¶¶ 3, 48.  This is sufficient to allege that PacifiCorp is actively involved

24   in or has some degree of control over the waste disposal process.  The truth of these allegations

25   can be tested at a more appropriate stage of the proceedings.  The Court denies PacifiCorp's

26

27   _____

[7] While it is true that materials held for future recycling are not RCRA solid waste, *Am. Mining
28   Cong. v. EPA*, 824 F.2d 1177, 1190–93 (D.C. Cir. 1987), the solid waste in issue are not the
     physical poles and TWW, but the Wood Treatment Waste from the Facility.

United States District Court
Northern District of California

1    motion to dismiss on these grounds.

2                              **3.      Solid Waste**

3              PacifiCorp alleges that the Wood Treatment Wastes are not solid wastes under RCRA for

4    two reasons: (1) RCRA's solid waste definition excludes industrial discharges which are point

5    sources subject to permits under the CWA and (2) the wood treatment chemicals are still serving

6    their intended purpose and have therefore not been discarded.  ECF No. 32 at 20–22.

7                              **a.      Permitted under CWA**

8              PacifiCorp argues that if the Wood Treatment Mixtures are subject to permits under the

9    CWA, they are excluded from the definition of "solid waste" under RCRA and therefore not

10   regulated under RCRA.  ECF No. 32 at 22.

11             RCRA's definition of solid waste excludes "industrial discharges which are point sources

12   subject to permits under section 1342 of [the CWA]."  42 U.S.C. § 6903(27).  In *Los Angeles*

13   *Waterkeeper v. SSA Terminals, LLC*, the court found that the complaint failed to "adequately

14   allege that the Facilities discharge non-industrial stormwater constituting solid waste subject to

15   [the] RCRA, as opposed to 'solid or dissolved material in . . . industrial discharges which are point

16   sources'" subject to the defendants' general permit under the CWA.  No. 22-CV-01198-FWS-

17   MRW, 2023 WL 7960773, at *16 (C.D. Cal. Nov. 14, 2023) (internal citations omitted).

18             PacifiCorp contends that "EcoRights has not distinguished between industrial and non-

19   industrial stormwater" and that under *L.A. Waterkeeper*, EcoRights fails to allege sufficient facts

20   to support a "solid waste" regulated under RCRA.  ECF No. 32 at 22.  EcoRights responds that

21   first, unlike *L.A. Waterkeeper*, PacifiCorp does not have a preexisting general permit governing

22   the discharges of industrial stormwater and therefore, this exception does not apply.  ECF No. 39

23   at 29–30; ECF No. 23 ¶ 171.  Next, EcoRights argues that its complaint makes clear that "(1) the

24   solid waste pollution at issue is not limited to pollution of 'waters of the United States'; (2) the

25   solid waste pollution at issue is broader than the pollutants regulated under the CWA; and (3) the

26   methods by which such pollutants are released into the environment . . . are not limited to storm

27   water associated with industrial activity."  ECF No. 39 at 30.

28             At the motion to dismiss stage, it is sufficient to observe that the Facility is not presently

*United States District Court*
*Northern District of California*

                                                    17

United States District Court
Northern District of California

subject to any CWA permits as a point source, such that PacifiCorp's motion on this ground must be denied.  Also, EcoRights has sufficiently alleged that there is pollution from the Facility that is broader than discharges from a point source.  The FAC states how pollutants discharge into the surrounding environment by means other than point source discharges of storm water.  First the "toxic Wood Treatment Mixtures Waste from the Poles and TWW travels in storm water to unpaved areas downstream of the Crescent City Facility where it contaminates surface sediments and infiltrates into the ground and groundwater." ECF No. 23 ¶ 62.  Second, the "contamination can further escape the Crescent City Facility when . . . [the] Wood Treatment Mixtures Waste are tracked off of the Crescent City Facility by vehicles, foot traffic, and/or in storm water and/or by wind, leaf blower, sweeping, powerwashing, and/or other natural or artificial processes that are designed to and/or do move material from one area to another." *Id.*  The Court finds that EcoRights' allegations are sufficient to explain that there are non-point source discharges and other types of pollutants constituting solid waste subject to RCRA.

### b.  Intended Purpose of Wood Treatment Mixtures

PacifiCorp argues that the Wood Treatment Mixtures are still serving their intended purpose, have not been discarded, and therefore cannot be "solid waste."  ECF No. 32 at 20–21. RCRA defines "solid waste" as:

> [A]ny . . . discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations[.]

42 U.S.C § 6903(27).  The Ninth Circuit has previously found that "discard" means to "cast aside; reject; abandon; give up." *ERF I*, 713 F.3d at 515.  The Ninth Circuit reasoned that "like pesticide applied to a field, preservative that falls to the base of a utility pole still serves its intended purpose by inhibiting the growth of vegetation, fungi, and other organisms," and held that "wood preservative that is washed or blown away from utility poles by natural means, [was] an expected consequence of the preservative's intended use, [and] has [therefore] not been 'discarded.'" *Id.* at 516.  Accordingly, "[w]hether a product has 'served its intended purpose and is no longer wanted by the consumer' is a 'key' consideration in determining whether a substance constitutes solid waste." *Id.* at 515.

1        EcoRights explains in its FAC that the "solid waste" is the discharge of Wood Treatment

2   Wastes "associated with the new, freshly treated utility poles, used treated utility poles or cross-

3   arms (collectively, 'Poles') and treated wood waste ('TWW') stored at the Crescent City Facility."

4   ECF No. 23 ¶ 1.  TWW, in turn, "means any wood items or fragments thereof that have been

5   treated with any of the Wood Treatment Mixtures but that are not complete Poles and/or cross-

6   arms destined for service, which includes, but is not limited to, out of service utility poles, used

7   utility pole segments, out of service cross arms, used cross arm segments, sawdust, splinters, wood

8   chips, and any other wood pieces and/or fragments." *Id.* ¶ 2 n.1.

9        PacifiCorp argues that any spillage or drippage is not discarded product because "the new

10  Poles, destined for installation . . . are not discarded or waste."  ECF No. 32 at 20.  PacifiCorp

11  further argues that the Poles stored at the Facility "are currently being used, or will be recycled

12  and then re-used."  ECF No. 45 at 15.  EcoRights responds that the Wood Treatment Mixtures "in

13  this case 'ha[ve] served [their] intended purpose and [are] no longer wanted by' PacifiCorp."  ECF

14  No. 39 at 24.

15       Under *ERF I*, the focus of this Court's inquiry is whether the *Wood Treatment Mixtures*—

16  and not the utility poles or TWW—have "served [their] intended purpose" and are "no longer

17  wanted by the consumer."  *ERF I*, 713 F.3d at 515.  While some of the poles stored at the Crescent

18  City facility might, as PacifiCorp contends, be "new, freshly treated utility poles," EcoRights

19  plausibly alleges that some of the wood preservative washes away from "out of service utility

20  poles," "out of service cross arms," "sawdust," "splinters," and "wood chips."  These materials are

21  clearly alleged to have been "abandoned and cast aside by the facilities' operators," creating at

22  least a dispute of fact as to whether the TWW is "discarded material."  *Cal. River Watch*, 39 F.4th

23  at 630.  Moreover, it follows logically that because out-of-service utility poles and like materials

24  no longer require wood preservative, the usefulness of the wood preservative left on the TWW is

25  eliminated.  *See Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d

26  1180, 1220 (E.D. Wash. 2015) ("Rather, this Court determined that the issue of whether manure

27  can be considered a solid waste hinges, factually, on whether the manure is handled and used in

28

United States District Court
Northern District of California

1    such a manner that its usefulness as a fertilizer is eliminated.").[8]  The Court will deny PacifiCorp's

2    motion on this ground.

3                    **4.    Imminent or Substantial Endangerment**

4            PacifiCorp argues that EcoRights has not properly alleged that the California Department

5    of Toxic Substances Control ("DTSC") or any other regulator has found that the alleged

6    discharges would support a finding of "imminent and substantial" endangerment.  ECF No. 32 at

7    22.  EcoRights responds that it "repeatedly alleges imminent and substantial endangerment based

8    on pollution of the Facility itself, pollution of the unfenced lot next door, pollution of the

9    neighborhood, pollution of nearby homes, pollution of nearby businesses, pollution of a nearby

10   cul-de-sac where children appear to play basketball, direct contact with storm water and/or

11   associated pollutants leaving the Facility, and pollution of various riparian areas and other natural

12   resource areas that are not waters."  ECF No. 39 at 30 (citing ECF No. 23 ¶¶ 3, 17, 48–50, 52, 53,

13   57–63, 68–70, 72–76, 148–54, 156, 157, 159, 161).

14          PacifiCorp cites no authority requiring that a plaintiff allege that DTSC investigated or

15   issued a notice of violation to show imminent and substantial endangerment to human health or

16   the environment.  The Court finds that EcoRights has sufficiently pleaded imminent and

17   substantial endangerment to human health or the environment.

18                   **5.    Duplicative of Clean Water Act**

19          EcoRights claims that PacifiCorp is violating both the CWA and RCRA based in part on

20   discharge of stormwater runoff from Poles and TWW.  PacifiCorp raises for the first time in reply

21   that "EcoRights' position violates RCRA's anti-duplication provision, [42 U.S.C. § 6905(a)] as it

22   would invoke the 'duplicative regulation' that the provision was intended to preclude."  ECF No.

23   45 at 19.  EcoRights argues in its sur-reply that PacifiCorp "wholly fails to identify any specific

24   statutory requirements imposed by the CWA that are inconsistent with RCRA remedies here."

25   ECF No. 59 at 6.

26   _____

27   [8] Indeed, Defendants acknowledge in a supplemental brief that "some of the used poles are damaged or have reached the end of their useful life and must be appropriately disposed of in an approved landfill."  ECF No. 75 at 9 (footnote omitted).  This supports the conclusion that the

28   wood preservative also is no longer useful.

United States District Court
Northern District of California

1    The anti-duplication provision of RCRA provides that RCRA will not apply to "any

2    activity or substance which is subject to the Federal Water Pollution Control Act . . ., the Safe

3    Drinking Water Act . . ., the Marine Protection, Research and Sanctuaries Act of 1972 . . ., or the

4    Atomic Energy Act of 1954 . . ., *except to the extent that such application (or regulation) is not*

5    *inconsistent with the requirements of such Acts*." 42 U.S.C. § 6905(a).  Accordingly, the Ninth

6    Circuit has held that "[the] anti-duplication provision does not bar RCRA's application unless that

7    application contradicts a specific mandate imposed under the CWA." *ERF II*, 874 F.3d at 1095.

8    That is, the application of RCRA must be "incompatible, incongruous, [or] inharmonious" with

9    CWA requirements for the anti-duplication provision to apply.  *Id.*  It is the defendant's burden to

10   show that an inconsistency between RCRA and CWA will result if the court does not dismiss the

11   RCRA claim.  *S.F. Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 866 (N.D. Cal.

12   2015).

13   Other courts have "declined to dispose of RCRA claims based upon [S]ection 6905 at the

14   motion to dismiss stage because 'discovery is needed to determine if the RCRA and CWA are

15   inconsistent.'" *Id.* (internal citations omitted).  At this stage, PacifiCorp has not shown that any

16   inconsistency between the CWA and RCRA will result from this Court's failure to dismiss the

17   RCRA claim.  Accordingly, the Court denies PacifiCorp's motion with respect to anti-duplication.

18                                                    **CONCLUSION**

19   For the reasons described above, the Court denies PacifiCorp's motion to dismiss.

20   **IT IS SO ORDERED.**

21   Dated:  June 26, 2024

22   _____

23                                                    JON S. TIGAR
                                                     United States District Judge

24

25

26

27

28

United States District Court
Northern District of California